PATRICIA RIVET MURRAY, Judge.
 

 This is a suit for wages, penalty wages, and attorney’s fees under the Louisiana Wage Payment Act, La. R.S. 23:631
 
 et seq.
 
 (“LWPA”). Ted Kaplon commenced this LWPA suit against both Rimkus Consulting Group, Inc., and its wholly-owned subsidiary, Rimkus Consulting Group, Inc. of Louisiana (collectively “Rimkus”).
 
 [1]
 
 From a judgment awarding Mr.. Kaplon wages (an additional 2005 bonus and a 2006 bonus), penalty wages, and attorney’s fees, Rimkus appeals. For the reasons that follow, we amend the judgment to include an additional award of attorney’s fees for the appeal and affirm the judgment as amended.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 From December 20, 2004, to December 31, 2006, Mr. Kaplon worked for Rimkus, a forensic engineering and technical consulting services company, at its New Orleans branch office. He worked for Rimkus as a senior consultant electrical engineer. Gary Bell, who was then Rimkus’ New Orleans branch manager, hired Mr. Ka-plon. During, the recruitment and hiring process, Mr. Bell [ 2told Mr. Kaplon that his compensation would include not only a salary, but also an annual profit sharing bonus. The bonus, albeit not part of Mr. Kaplon’s written employment agreement, was provided by the Rimkus Profit Sharing Bonus Plan, which is discussed in detail elsewhere in .this opinion. In 2006, Mr. Kaplon was paid a total salary of $88,000. In the summer of 2006, he was paid $24,000 for the 2005- annual bonus. Effective December 31, 2006, Mr. Kaplon resigned. Although he worked the entire 2006 calendar year, Mr. Kaplon was not paid the 2006 bonus that Rimkus paid its employees in July 2007.
 

 In June 2007, Mr. Kaplon was contacted by Rimkus to perform some contract work on an old file. In an e-mail he sent in July 2007 regarding payment for his contract services, Mr: Kaplon requested that he
 
 *728
 
 also be paid the 2006 annual bonus. Rim-kus’ response was that it had a policy of not paying a bonus to any employee who resigned to go into competition against it, which Mr. Kaplon had done.
 

 On January 28, 2008, Mr. Kaplon filed this action under the LWPA seeking payment of not only the 2006 bonus, but also an additional 2005 bonus. In his petition, he alleged that during his employment Rimkus maintained and published to its employees a Profit Sharing Bonus Plan, which was intended to entice its employees to work harder and to supplement their salaries and income. He further alleged that he relied upon and considered all payments under the Profit Sharing Bonus Plan to be part of his compensation. Due to Mr. Kaplon’s and Rimkus’ other employees’ efforts following Hurricane Katrina, Mr. Kaplon alleged that Rimkus earned record profits for 2005 and 2006. Rimkus, however, allegedly illegally withheld payment of $500,000 from the 2005 bonus pool. As a result, Mr. Kaplon contended that Rimkus owed him an additional 2005 bonus for his ^proportionate share of the amount withheld from the bonus pool. Mr. Kaplon thus sought to recover in this suit an additional 2005 bonus, a 2006 bonus, penalty wages, and attorney’s fees under the LWPA.
 

 In May 2009, a two-day bench trial was held. At trial, the parties introduced various documentary evidence including copies of the pertinent Rimkus Profit Sharing Bonus Plan documents. The plan documents introduced revealed that during the period of Mr. Kaplon’s employment — December 2004 to December 2006 — Rimkus actually had two plans. The first plan was adopted on August 22, 2000, and remained in effect until April 25, 2006 (the “2000 Plan”). On April 25, 2006, Rimkus adopted a new plan, which was a modified version of the original plan (the “2006 Plan”). The primary difference between the two plans was that the 2006 Plan substantially lowered the percentages used to calculate the bonus pool; otherwise, the plans were substantially similar. The 2000 Plan was applicable to the 2005 bonus; the 2006 Plan was applicable to the 2006 bonus.
 

 Both plans recited that the purpose of the bonus was “[t]o enable the Corporation to better reward those employees who most help with making PROFITS for the Corporation” and “[t]o provide additional compensation to all employees when the Corporation makes sufficient PROFITS.”
 

 Neither plan provided for payment of the bonus at year end. The 2000 Plan provided for payment of the Annual Profit Sharing Bonus within the first quarter of the year after the bonus was earned, but no later than thirty days after the corporation received from its certified public accountant (“CPA”) its annual audited financial statements. The 2006 Plan provided for payment of the bonus within the second quarter of the year after the bonus was earned, but no later than thirty days after the receipt from the CPA of the audited financial statements. The |42006 Plan further provided that “[s]hould sufficient funds not be available, the bonus payments may have to be delayed until monies are collected.”
 

 Both plans provided for a lump sum annual distribution of the bonus payment and set forth the same method for calculating the bonus pool of money to be made available for such annual distribution. Under both plans, the calculation of the bonus pool included two components: a divisional part and a corporate part. Under the 2000 Plan, the divisional part of the bonus pool was determined as follows:
 

 Those divisions and branch offices which make an annual pre-tax operating income PROFIT (after payment of Indi
 
 *729
 
 vidual Incentive Compensation Plan Payments and after allocations of Corporate Marketing and Corporate General Administrative Costs have been made) shall receive PROFIT SHARING BONUS PAYMENTS which, in aggregate, are equal to Twenty percent (20%) of the Pre-Tax, Pre-Bonus NET OPERATING INCOME of the Corporation, as shown in the Monthly and Annual Accounting Financial Reports.
 

 The 2006 Plan contained similar wording, but decreased the percentage to “Ten percent (10%) of the Pre-Tax, Pre-Bonus TOTAL OPERATING INCOME.”
 
 [2]
 

 Both plans contained a provision, which was labeled Section F, that set forth the following suggested distribution ranges for the division part of the bonus pool:
 

 • Division Manager-No less than 15%, no more than 50% of total division bonus.
 

 • Professional Billing Staff-No less than 30%, no more than 60% of total division bonus.
 

 la* Marketing Staff-No less than 10%, no more than 30% of total division bonus.
 

 • Administrative and Clerical Staff-No less than 5%, no more than 15% of total division bonus.
 

 The plans expressly provided that these suggested distribution ranges “may be adjusted to allow for individual office staffing.” Further, the plans provided that the distribution within each branch shall be reviewed and approved by the board of directors.
 

 The 2000 Plan provided the following regarding the corporate part of the bonus pool:
 

 An additional ANNUAL CORPORATE BONUS will be paid to all eligible employees based on remaining Corporate Pre-tax Net Operating Income after all Individual Incentive Compensation Plan Payments have been made and deducted and all Division and Branch Office DIRECT PROFIT SHARING BONUS PAYMENT accounting calculations have been made ...
 

 The Corporate Bonus is to be calculated based on Annual Net Pre-tax Operating Income (after direct bonus payments) as follows:
 

 Annual Corporate Bonus — Based on Net Pre-tax Operating Income Remaining After Deductions for Division and Branch Office Direct Profit Sharing Bonus Payments
 

 • Less than $300,000/year NONE
 

 • $300,000/year-$600,000/year 20%
 

 • $600,000/year-$l,200,000/year 25%
 

 • More than $1,200,000/year 30%
 

 The 2006 Plan included a similar provision for determining the CORPORATE BONUS, but set forth a higher threshold and a lower percentage:
 

 • Less than $3,000,000/year NONE
 

 * More than $3,000,000/year 10%
 

 Both the 2000 Plan and 2006 Plan further provided that the remaining CORPORATE BONUS after deducting the Corporate Office Staff portion would be distributed to the branch offices and divisions as follows:
 

 
 *730
 
 • 80% of the remaining amount shall be allocated to the branch offices and divisions based upon a PRO-RATA SERVICE BILLINGS for the year basis. The manager of that office or division shall then make distribution of the bonus in accordance with [Section F, quoted earlier in this opinion, which sets forth the suggested distribution ranges for the division part of the bonus pool to the employees.]
 

 • The remaining 20% of the Division and Branch Office portion of the CORPORATE BONUS shall be distributed to branch office and division personnel at the discretion of the Board of Directors.
 

 The record reflects that the New Orleans branch’s share of the 2005 bonus pool consisted of a division part of $382,386 and a corporate part of $123,010, which amounted to a total 2005 bonus pool of $505,396. It is undisputed, as Mr. Kaplon alleged in his petition, that Rimkus diverted $500,000 from the 2005 bonus pool and reallocated that amount to the 2006 bonus pool. As a result, the New Orleans branch’s share of the 2005 bonus was reduced by $83,156 to $422,240. Stated otherwise, the New Orleans branch’s share of the $500,000 that was diverted was $83,156.
 

 As noted, Mr. Kaplon was paid a 2005 bonus of $24,000, which was 5.6% of the New Orleans branch’s share of the 2005 bonus that was distributed ($422,240). Since the bonus he was paid for 2005 amounted to a particular percentage (5.6%) of the bonus pool actually paid to the New Orleans branch’s employees ($422,240), Mr. Kaplon claimed that he was entitled to an additional 2005 bonus calculated based on that same percentage of the additional amount that the New |7Orleans branch should have received, $83,156. He thus claimed that he was entitled to an additional 2005 bonus of $4,656.74 (5.6 % of $83,156).
 

 Insofar as the 2006 bonus, Rimkus’ board of directors passed a resolution dated July 13, 2007, to distribute $1.8 million in 2006 bonuses to its management and employees. Curtis Brown, Rimkus’ chief executive officer (“CEO”) and president, testified that the $1.8 million bonus pool that was made available for distribution in 2006 included the $500,000 that was diverted from the 2005 bonus pool. The record reflects that the New Orleans branch’s share of the 2006 bonus pool consisted of a division part of $179,978 and a corporate part of $52,412, which amounted to a total 2006 bonus pool of $232,390.
 

 Mr. Kaplon received no 2006 bonus. He contended that he was entitled to a 2006 bonus because he worked the -entire 2006 calendar year. He proposed that a'reasonable method for calculating the 2006 bonus he should have received was to use the same percentage he received in 2005 (5.6%) and to award him that percentage of the 2006 bonus pool allocated to the New Orleans branch ($232,390), which equals $13,013.84.
 

 At trial, Mr. Kaplon called two witnesses: Mr. Bell and himself.
 

 Mr. Bell, who was the New Orleans branch manager and the Central Region manager at Rimkus during 2005 and part of 2006, testified that he hired Mr. Kaplon. Mr. Bell testified that he generally emailed the Rimkus Profit Sharing Plan to new employees. Mr. Bell testified that for the year 2005 Rimkus failed to pay the entire bonus amount that was earned. He explained that he was told at a meeting by his' supervisor, Mr. Brown, that Rimkus had decided “that they were going to reduce the plan for the 2005 payment , [by $500,000] and put that money | finto the 2006 plan because they were going to low
 
 *731
 
 er the percentage for the following year but did not want to make that known.”
 

 Mr. Bell testified that as branch manager he allocated the bonus pool to the branch employees using a model based on the number of hours each individual employee worked after subtracting out for the administrative staff. He testified that regardless of the dollar amount of the bonus pool allocated to his branch he would have used the same model to distribute the bonus.
 

 Mr. Kaplon testified that he worked for Rimkus from December 2004 to December 2006. Although he acknowledged that his employment contract contained no reference to a bonus, Mr. Kaplon testified that he was informed by Mr. Bell, who hired him, that a term of his employment was that he would be part of Rimkus’ bonus program. Other than working the calendar year, Mr. Kaplon was not told of any requirement for being entitled to receive the annual bonus. Mr. Kaplon testified that Mr. Bell never explained to him how the bonus plan worked or how the bonus was to be calculated. However, he testified that he was told that he would be treated honestly and fairly in that regard. Mr. Kaplon acknowledged that during the time he was employed at Rimkus he never saw a written or an internet (electronic) version of the bonus plan. Mr. Kaplon testified that he worked through the entire 2006 calendar year. When he resigned, Mr. Kaplon was not told that he was not entitled to a bonus for 2006. He, therefore, expected to be paid his 2006 bonus in 2007.
 

 Mr. Kaplon testified that he made a demand for the 2006 bonus in an e-mail dated July 27, 2007, to John Dufour, who took over after Mr. Bell left the company. He explained that the e-mail came about after he was contacted by Mr. Dufour to work for Rimkus on an old file. In his email, Mr. Kaplon wrote, “[i]n |saddition, since I worked the entire year last year, it would also be fair for me to receive my fair share of last year’s bonus.” Mr. Kaplon acknowledged that he referenced in his email only the 2006 bonus and that he neither made a demand for the 2005 additional bonus nor communicated with Rimkus that he felt the 2005 bonus was inadequate or unfairly calculated until January 2008 when he filed this suit.
 

 At trial, Rimkus also called two witnesses: Mr. Brown, Rimkus’ current president and CEO; and Stephen Romig, Rim-kus’ expert CPA.
 

 Mr. Brown testified that when Mr. Ka-plon resigned he was Rimkus’ senior vice president and was with the board of directors. Mr. Brown testified that Mr. Ka-plon’s bonus under the 2006 Plan was not capable of being calculated on either December 31, 2006, when he resigned, or fifteen days later, January 15, 2007. He explained that the process of compiling the financial data needed to comply with the terms of the plan and the audit required to confirm the accuracy of the data took about three months. He further explained that the problem was compounded because the apportionment of the bonus pool to the individual employees then had to be decided by management and approved by the board of directors. For these reasons, Rimkus did not distribute bonus checks until June or July of the following year. Mr. Brown also pointed out that distribution of the bonuses was contingent on the company having sufficient cash flow to pay them.
 

 According to Mr. Brown, Rimkus’ profit sharing plan was not part of the compensation for services rendered; rather, he testified that the salary and incentive plan was the compensation. Mr. Brown denied that Rimkus published or distributed the bonus plans to its employees; however, he admitted that Rimkus 110made them aware
 
 *732
 
 of it. Mr. Brown also admitted that Mr. Bell used the bonus plan as a recruitment and a retention tool.
 

 Mr. Brown acknowledged that the bonus plan provided a set amount to be allocated to each branch. Mr. Brown testified that the New Orleans branch’s share of the $500,000 withheld from the 2005 bonus pool was $83,156. He further testified that if the $83,156 was added into the bonus pool for the New Orleans branch, the payment actually made to the New Orleans branch’s professional billing staff, of which Mr. Kaplon was a member, would have been about 38%, which was within the range set forth in Section F of the 2000 Plan for professional billing staff — 30% to 60%. Mr. Brown testified that the bonus payments to the New Orleans branch employees for the years 2005 and 2006 did not correspond to the number of hours worked. Mr. Brown testified that Rimkus had a policy of not paying a profit sharing bonus to former employees who left to go into competition with the company. He testified that only once did the company make an exception to its policy against paying a bonus to former employees; however, in that case, the former employee went to work for a company that was not in competition with Rimkus.
 

 Stephen Romig, Rimkus’ expert CPA, testified that the multiple discretionary aspects of the Rimkus Profit Sharing Plan created too many variables to determine the allocable bonus amount that Mr. Ka-plon was due when he resigned, on December 31, 2006, or fifteen days later, on January 15, 2007.
 

 At the close of Mr. Kaplon’s case, Rim-kus filed a motion for involuntary dismissal, which the trial court denied.
 

 In July 2009, the trial court rendered judgment in Mr. Kaplon’s favor. The trial court found the bonuses at issue constituted wages and thus the LWPA ^applied. The trial court further found that Mr. Kaplon was due a total of $72,662.86, which it itemized as follows: an additional 2005 bonus of $4,656.74; a 2006 bonus of $13,013.84; penalty wages of $39,150.00; and attorney’s fees and costs of $15,842.28. From this judgment, Rimkus appeals asserting the trial court erred in four respects: (i) finding that the bonuses at issue are wages under the LWPA; (ii) awarding of an additional 2005 bonus instead of finding Mr. Kaplon had been paid within the range of the Rimkus’ profit sharing plan; (iii) awarding a 2006 bonus; and (iv) awarding penalties and attorney’s fees under the LWPA. Answering the appeal, Mr. Kaplon seeks additional attorney’s fees for the work on appeal.
 

 DISCUSSION
 

 The three applicable statutes concerning wage disputes are as follows.
 

 First, La. R.S. 23:631 A(l)(b) provides:
 

 Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
 
 [3]
 

 
 *733
 
 Second, La. R.S. 23:632 provides for penalties and attorney’s fees to be assessed against any employer that fails to timely pay wages within a certain time period following demand by the employee.
 

 112Third, La. R.S. 23:634 A, which prohibits wage forfeiture policies, provides:
 

 No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation.
 

 These statutes are intended to “assure the prompt payment of wages upon an employee’s discharge or resignation.”
 
 Beard v. Summit Institute for Pulmonary Medicine and Rehabilitation, Inc.,
 
 97-1784. p. 3 (La.3/4/98), 707 So.2d 1233, 1236. A claimant seeking to recover penalty wages and attorney’s fees under La. R.S. 23:632 must establish the following three factors: (1) that wages were due and owing; (2) that demand for payment was made where the employee was customarily paid; and (3) that the employer did not pay upon demand.
 
 Becht v. Morgan Bldg. & Spas, Inc.,
 
 02-2047, p. 4 (La.4/23/03), 843 So.2d 1109, 1112 (collecting cases).
 

 Being penal in nature, La. R.S. 23:632 must be strictly construed, and its provisions yield to equitable defenses.
 
 Stall v. Professional Divers of New Orleans, Inc.,
 
 99-262, p. 7 (La.App. 5 Cir. 8/31/99), 739 So.2d 1005, 1009. When a bona fide dispute exists over the amount of wages due, an employer’s failure to pay is not an arbitrary refusal and no penalties will be awarded.
 
 Id.
 
 A trial court’s determination of whether an employer is arbitrary or in bad faith for purposes of imposing penalty wages is a question of fact and is, therefore, subject to the manifest error standard of review.
 
 Loup v. Louisiana State School for the Deaf,
 
 98-0329, p. 6 (La.App. 1 Cir. 2/19/99), 729 So.2d 689, 693.
 

 The issues Rimkus raises on appeal relate to the applicability of the LWPA— whether the bonuses at issue are wages covered by the LWPA — and whether the bonuses were due and owing. Rimkus also contests the award of penalties and attorney’s fees. To address these issues we divide our analysis into four parts: (i) classification of profit sharing bonuses as wages under the LWPA; (ii) 2005 additional bonus amount due; (iii) 2006 bonus amount due; and (iv) penalties and attorney’s fees due.
 

 (i) Classification of profit sharing bonuses as wages under the LWPA
 

 The threshold issue in this case is whether the bonus at issue are “wages” under the LWPA. Whether a bonus constitutes wages under the LWPA is a mixed question of law and fact.
 
 Batiansila v. Advanced Cardiovascular Systems, Inc.,
 
 952 F.2d 893 (5th Cir.1992). The proper standard of review of a trial court’s determination of such a mixed question of law and fact generally is the manifest error standard.
 
 See Reed v. Wal-Mart Stores, Inc.,
 
 97-1174 (La.3/4/98), 708 So.2d 362, 364 (holding the manifest error standard of review is the proper standard to be applied to the mixed question of law and fact
 
 *734
 
 presented by a determination of whether a defect presents an unreasonable risk of harm).
 

 In finding the bonuses Mr. Kaplon demanded constituted wages, the trial court reasoned as follows:
 

 [T]he test for the determination of whether payment to an employee is a “wage” under La. R.S. 23:631 is not whether the amount owed was
 
 paid
 
 by the “hour, day, week or month,” but rather whether the amount owed was
 
 earned
 
 by the employee during a pay period. In the instant case, the facts and evidence clearly demonstrate that the bonuses at issue were earned during the pay periods in which Plaintiff worked in 2005 and 2006.
 

 Additionally, every Louisiana appellate decision subsequent to
 
 Boudreaux [v. Hamilton Medical Group, Inc.,
 
 94-0879 (La.10/17/94), 644 So.2d 619,] has echoed the same reasoning.
 

 In
 
 Thomas v. Orleans Private Industry Council,
 
 95-1577, pp. 6-7 (La.App. 4 Cir. 2/15/96), 669 So.2d 1275, 1279, we questioned the holding in
 
 Dore v. WHC uLease Service, Inc.,
 
 528 So.2d 235, 239 (La.App. 3d Cir.1988), that an annual bonus was not a wage even though it was a term of employment because it was not payable “by the day, the hour, the week, or the month.” We noted that “[s]uch a restrictive reading of § 631 overlooks
 
 Bou-dreaux’s
 
 conclusion that § 631 applies to ‘wages’ due under the pay period.”
 
 Thomas,
 
 95-1577 at p. 7, 669 So.2d at 1280. Rejecting the argument that this statute does not apply to a bonus payable yearly, we reasoned that the statute refers to “wages,” which means money paid or received in return for work and that “[t]he phrase ‘whether the employment is by the hour, day, week, or month’ refers to the pay period for the compensation.”
 
 Thomas,
 
 95-1577 at pp. 6-7, 669 So.2d at 1279 (quoting
 
 Boudreaux v. Hamilton Medical Group, Inc.,
 
 94-0879 (La.10/17/94), 644 So.2d 619, 622). In finding the bonus at issue in
 
 Thomas
 
 constituted wages, we reasoned that the employee had relied on the bonus as additional compensation based on his initial contract negotiations and that the bonus was due under the terms of the employee’s employment for specific services rendered during a pay period.
 

 Our research reveals that other states— by statute
 
 [4]
 
 and by case law
 
 [5]
 
 — have declared profit sharing bonuses do not constitute wages for purposes of similar wage payment statutory schemes. The governing Louisiana statute contains no such exception, and the Louisiana jurisprudence has declined to infer one. In classifying amounts due to departing employees as wages, the Louisiana jurisprudence thus has looked beyond the label and recognized that “[b]onuses paid as part of an incentive plan to encourage longevity or production may be called ‘bonuses’ but are more in the nature of commissions and are considered wages.” Rick J. Norman,
 
 Louisiana Practice Series, Employment Law
 
 § 4.26(c)(2009 ed.)(citing
 
 Thomas, supra; Kearney v. Lee Medical International,
 
 
 *735
 

 Inc.,
 
 06-597 (La.App. 5 Cir. 1/16/07), 951 So.2d 417; and
 
 Williams v. Dolgencorp, Inc.,
 
 04-139 (La.App. 3 Cir. 9/29/040, 888 So.2d 260));
 
 see also Cochran v. American Advantage Mortgage Co.,
 
 93 1480 (La.App. 1 Cir. 6/24/94), 638 So.2d 1235 (finding that bonuses were part of compensation and thus constituted wages).
 

 The bonuses at issue in this case fall within the ambit of a bonus paid as part of an incentive plan. As noted, both the 2000 Plan and the 2006 Plan declare that the purpose of the bonuses was to “reward those employees who most help with making PROFITS for the Corporation” and to “provide additional compensation to all employees when the Corporation makes sufficient PROFITS.” Moreover, the record supports the trial court’s finding that the bonuses, albeit not a part of Mr. Kaplon’s written employment agreement, were a bargained for part of his compensation. Mr. Kaplon, Mr. Bell, and Mr. Brown all testified that the profit sharing plan was used as both a recruitment tool and an employee incentive tool.
 

 On appeal, Rimkus contends that “annual discretionary payments made under a Profit Sharing Plan — to be paid in the next calendar year after an audit and dependent upon variables — are not ‘wages.’ ” Rimkus stresses that in addition to the Profit Sharing Bonus Plan it offered to employees an Individual Incentive Compensation Plan, which provided for a merit-based bonus payment to employees who worked more than a certain number of billable hours. Rimkus 11ficontrasts the incentive plan, under which the bonus amount could be calculated and which it admits would be wages under the LWPA, with the Profit Sharing Bonus Plan, under which the bonus amount could not be calculated and which it contends is not wages. Because Mr. Kaplon never qualified for the incentive plan, we find that plan is not relevant.
 

 Contrary to Rimkus’ contention, the inability to calculate the amount of the profit sharing bonuses at year end is not disposi-tive of the issue of whether the bonuses are wages. Rather, as the trial court recognized, the dispositive factor is that the bonuses were earned during Mr. Kaplon’s term of employment. The record also reflects that Rimkus routinely páid the annual profit sharing bonuses during the year following which the bonuses were earned. We thus find the trial court’s determination that the bonuses at issue are wages under the LWPA is not manifestly erroneous.
 

 (ii) 2005 Additional Bonus Amount Due
 

 Mr. Kaplon’s claim for an additional 2005 bonus is premised on the undisputed fact that Rimkus withheld $500,000 from the 2005 bonus pool and carried over that amount to the 2006 bonus pool. Mr. Bell and Mr. Brown • both testified that Rimkus’ reason for withholding the $500,000 was to ease the transition from the amount payable in 2005 under the original 2000 Plan to the lower amount that was going to be payable in 2006 under the 2006 Plan. Mr. Brown further testified that there were other business reasons that prompted Rimkus to withhold the $500,000; he explained:
 

 We were facing a couple of things. One is we had very high accounts receivable at that time. Company-wide, we had roughly $8 million worth of accounts receivable over 120 days old. And so we just felt like it was prudent at that particular time to hold some money back. It was that, and we also started seeing at that particular point in time, as |17well, some lawsuits started propping
 
 *736
 
 up from Hurricane Katrina and our legal costs started escalating.
 

 Rimkus contends that its bonus plan was a discretionary guideline and that as a privately held corporation it had the right for business reasons to defer the $500,000 from 2005 to the following plan year. Rimkus further contends that the trial court erred in failing to find that the 2005 bonus of $24,000 that Mr. Kaplon was paid was within the range set forth in the bonus plan for him as a member of the New Orleans branch’s professional billing staff.
 

 Mr. Kaplon, on the other hand, concedes that Rimkus had the right to change the amount of the payment under its bonus plan going forward, but he contends that Rimkus lacked the right to withhold wages that were earned in a prior year. Agreeing with Mr. Kaplon, the trial court rejected Rimkus’ argument that the bonus plan was a discretionary guideline.. In so finding, the trial court reasoned that Rimkus’ contention that the payment under the 2000 Plan was discretionary was belied by the terms of the plan and its actions. The trial court found it telling that Rimkus amended the bonus plan in 2006, stating “[i]f the payments under the Bonus Plan were truly discretionary as Rimkus contends, there would be no need to amend the Bonus Plan in 2006, as Rimkus could simply pay any amount it wanted to pay.” The court thus found that Rimkus was required to pay the entire amount of bonus wages it calculated was owed to the New Orleans branch employees. The record reflects that the 2000 Plan contained no provision authorizing Rimkus to carry over amounts from one plan year to the next. Indeed, Mr. Brown acknowledged that the plan did not include a carry over provision, but testified that “[j]ust because there isn’t [such a provision] doesn’t mean that we 11sshouldn’t be able to do that.” The trial court’s finding that Rimkus lacked the right to do so was not manifestly erroneous.
 

 Insofar as the calculation of the additional 2005 bonus due to Mr. Kaplon, the trial court, adopting Mr. Kaplon’s proposal, used the specific percentage of the bonus that Mr. Kaplon was actually paid that year (5.6%) to calculate the additional amount due. The trial court thus concluded that “had Rimkus properly paid all of [the] wages that were owed to the New Orleans office, Plaintiff would have been entitled to 5.6% of the additional $83,156 in unpaid bonus wages,” which equaled $4,656.74 in unpaid 2005 bonus wages. Rimkus does not dispute the amount of additional 2005 bonus awarded to Mr. Ka-plon.
 

 In addressing a similar LWPA claim brought by Mr. Bell and two other Rimkus employees for an additional 2005 bonus under the same 2000 Plan, the Louisiana Fifth Circuit Court of Appeal affirmed the trial court’s finding that no additional amount was due for 2005.
 
 Bell v. Rimkus Consulting Group, Inc. of Louisiana,
 
 09-943, p. 6 (La.App. 5 Cir. 1/12/10), 31 So.3d 446, 450.
 
 [6]
 
 Rimkus contends that we should follow the holding in
 
 Bell
 
 and reverse the trial court’s holding to the contrary in this case. We disagree.
 

 The employees in
 
 Bell,
 
 like Mr. Kaplon in this case, argued that the 2000 Plan was mandatory insofar as the allocation of the amounts to be distributed to the New Orleans employees. Particularly, the Fifth Circuit noted that the employees argued that “there is nothing under the Plan that allows defendants to change the amount of money that is required to be distributed to the company’s divisions and branches” and
 
 *737
 
 that “if bonus payments under the Plan are discretionary, then there 11flwould have been no reason for defendants to have amended the Plan in 2006 to make contributions for bonus payment discretionary by the company.”
 
 Bell,
 
 09-343 at p. 5, 31 So.3d at 449. Although noting the employees’ argument, the Fifth Circuit failed to address it. Unlike in
 
 Bell,
 
 the trial court in this case addressed the issue and concluded that the 2000 Plan was not discretionary and that Rimkus was not allowed to change the amount of money required to be distributed. As discussed above, we find the trial court’s finding was not manifestly erroneous.
 
 [7]
 
 For these reasons, we affirm the trial court’s. award to Mr. Kaplon of an additional 2005 bonus of $4,656.74.
 

 (Hi) 2006 bonus amount due
 

 Rimkus contends that the trial court erred in awarding Mr. Kaplon a 2006 bonus for several reasons. First, Rimkus points out that it did not pay the 2006 bonus to its employees until July 2007, seven months after Mr. Kaplon resigned. Rimkus emphasizes that, as Mr. Brown testified, it has never paid a bonus to an employee who left the company to compete against it. Rimkus further notes that it only once made an exception to its policy of not paying a bonus to former employees by paying an employee who left the forensic, accident reconstruction business altogether. Second, Rimkus contends that the terms of the 2006 Plan and the testimony of Mr. Bell, Mr. Brown, and its expert CPA, Mr. Rumig, established that it was not possible to calculate the amount of the 2006 bonus due Mr. Kaplon within the statutory period set forth in the LWPA. Rimkus contends that given the |20wide discretion afforded the management to distribute individual bonuses and given that any payment under the 2006 Plan was not due on December 31, 2006, when Mr. Ka-plon resigned, no 2006 bonus was due.
 

 Mr. Kaplon counters that because he worked the entire calendar year 2006, he earned and was entitled to be paid a 2006 bonus. He further counters that Rimkus’ policy of refusing to pay him any bonus because he was no longer an employee constituted a prohibited wage forfeiture under La. R.S. 23:634.
 

 Agreeing with Mr. Kaplon, the trial court reasoned that “nowhere did Rimkus state that an employee must be employed at the time the bonus is actually paid in order to be eligible for payment of the bonus.” The trial court further reasoned that Rimkus’ policy of imposing such a requirement was invalid and violated La. R.S. 23:634. In support, the trial court quoted this court’s reasoning in
 
 Pender v. Power Structures, Inc.,
 
 359 So.2d 1321, 1322-23 (La.App. 4th Cir.1978), that “[t]he public policy of this state expressed in R.S. 23:634 prohibits an employer from forfeiting such compensation when the employee works for the entire period of profits upon which the bonus was based.”
 
 Id.
 

 The record reflects that Mr. Kaplon worked for Rimkus the entire 2006 calendar year. Mr. Bell testified that if Mr. Kaplon had still been employed at Rimkus at the time the 2006 bonus was paid, Mr. Kaplon would have received a 2006 bonus.
 
 *738
 
 Rimkus’ only reason for refusing to pay Mr. Kaplon a bonus for that year was its policy of not paying a bonus to an employee who leaves to go into competition with it. The trial court correctly found that Rimkus’ policy violated the statutory prohibition against wage forfeiture set forth in La. R.S. 28:634.
 

 Insofar as the calculation of the 2006 bonus, Rimkus does not challenge the trial court’s adoption of Mr. Kaplon’s proposed method of calculating the amount
 
 \9Aof
 
 the 2006 bonus to which he was due — to use the same percentage he received in 2005 (5.6%) and to award him that percentage of the 2006 bonus pool allocated to the New Orleans branch ($232,390), which equals $13,013.84. For these reasons, we affirm the trial court’s award to Mr. Kaplon of a 2006 bonus of $13,013.84.
 

 (iv) penalties and attorney’s fees due
 

 As noted, La. R.S. 23:632 provides for the award of penalty wages and attorney’s fees to be assessed against any employer that fails to timely pay wages within a certain time period following demand by the employee. The trial court in this case awarded Mr. Kaplon penalty wages under La. R.S. 22:632 in the amount of $39,150 (ninety days at the rate of $435 per day).
 

 Rimkus contends that even assuming that the trial court correctly concluded that Mr. Kaplan was due wages under the LWPA, it erred in finding that he was entitled to an award of penalty wages. In support, Rimkus cites the jurisprudence requiring that for an employee to recover penalty wages, the employer must be shown to have acted in bad faith or in an arbitrary or unreasonable manner.
 
 Cupp v. Banks,
 
 25,762, p. 2 (La.App. 2 Cir. 5/4/94), 637 So.2d 678, 679. Rimkus contends that Mr. Kaplon had not established any bad faith or arbitrariness in its refusal to pay him a 2006 bonus. Rimkus further contends that its policy of not paying a bonus to an employee who leaves to go into competition with it is “common in business.”
 

 Mr. Kaplon responds that the burden was on Rimkus to establish the equitable defense it asserts — that its failure to pay was not in bad faith or arbitrary.
 
 Batiansila,
 
 952 F.2d at 897 (noting that to impose burden on employee to prove bad faith “would turn this equitable exception on its head” and finding that “the burden of proof is on the defendant to show that it has an equitable defense.”) He further responds that Rimkus did not submit any evidence at trial regarding whether its illegal practice was common in business. Regardless, Mr. Kaplon contends that Rimkus’ reliance on an unlawful wage forfeiture policy was not a good faith, non-arbitrary defense. We agree.
 

 An employer’s “[r]eliance on an unlawful company policy does not constitute a good faith non-arbitrary defense to liability for unpaid wages.”
 
 Beard v. Summit Institute for Pulmonary Medicine and Rehabilitation, Inc.,
 
 97-1784, p. 9 (La.3/4/98), 707 So.2d 1233, 1237. As discussed above, the trial court correctly concluded that Rimkus’ policy of refusing to award a bonus to an employee who resigns to go into competition with it violates the statutory prohibition against wage forfeiture set forth in La. R.S. 23:634. Rimkus’ reliance on that policy as an equitable defense is thus misplaced. Rimkus does not challenge the trial court’s calculation of penalty wages. We thus affirm the trial court’s award of penalty wages of $39,150.
 

 Unlike penalty wages, the jurisprudence has not recognized equitable defenses to the award of attorney’s fees in the event that a “well-founded suit” for wages is filed.
 
 Beard, supra.
 
 A “well-founded suit” is defined as one in which
 
 *739
 
 the employee is successful in recovering unpaid wages.
 
 Cleary v. LEC Unwired, L.L.C.,
 
 00-2532 (La.App. 1 Cir. 12/28/01), 804 So.2d 916. When an employee brings a “well-founded suit,” an award of attorney’s fees is mandatory.
 
 Id.
 
 Stated otherwise, “[w]hen an employee is forced to file suit to recover his unpaid wages, the award of reasonable attorney’s fees is mandatory pursuant to La. R.S. 23:632.”
 
 Burns v. Schultz,
 
 02-0628, p. 3 (La.App. 4 Cir. 9/18/02), 828 So.2d 649, 651. The trial court awarded $15,842.28 in attorney’s fees. Although Rimkus assigned as error the award of attorney’s fees, it did not brief that issue. The reasonableness l^of the trial court’s award of attorney’s fees is supported by an affidavit from Mr. Ka-plon’s attorney and the attachments thereto. We thus affirm the trial court’s attorney’s fees award of $15,842.28.
 

 Mr. Kaplon answered Rimkus’ appeal and requested additional attorney’s fees for his attorney’s work on appeal. In support, Mr. Kaplon attached an affidavit from his attorney and attachments thereto supporting an additional attorney’s fee award of $5,242.94. Because we affirm all of the trial court’s findings in Mr. Kaplon’s favor in this LWPA case, we find it appropriate to award a reasonable amount of additional attorney’s fees for the appeal. Given the complicated nature of the case and counsel’s affidavit and attachments thereto, we find an additional award in the amount requested is reasonable. We thus amend the judgment to award additional attorney’s fees of $5,242.94.
 

 DECREE
 

 For the foregoing reasons, the trial court’s judgment is amended to award $5,242.94 in additional attorney’s fees for the appeal and the judgment, as amended, is affirmed.
 

 JUDGMENT AMENDED AND AFFIRMED AS AMENDED.
 

 [1]
 

 . Mr. Kaplon's employment contract was with Rimkus Consulting Group, Inc. of Louisiana. Although the pre-trial outline lists as a contested factual issue whether Rimkus Consulting Group, Inc., and Rimkus Consulting Group, Inc. of Louisiana operated as a single enterprise, the issue was neither raised at trial nor on appeal. For purposes of this appeal, we thus refer to the defendants singularly as Rimkus.
 

 [2]
 

 . The 2000 Plan also included the following provision regarding the divisional part:
 

 Those divisions and branch offices which make a PROFIT for the year shall receive PROFIT SHARING BONUS PAYMENTS (equal in total to 20% of the Corporate PreTax, Pre-Bonus NET OPERATING INCOME) in proportions based upon each of their relative contributions to the TOTAL PRE-TAX, PRE-BONUS, NO LOSSES, PROFIT of the Corporation ...
 

 The 2006 Plan included a similar provision, but decreased the percentage to "(equal in total to 10% of the Corporate Pre-tax, Pre-Bonus TOTAL OPERATING INCOME).”
 

 [3]
 

 . La. R.S. 23:631 B provides:
 

 In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action
 
 to
 
 enforce such a wage
 
 *733
 
 claim and proceed pursuant to Code of Civil Procedure Article 2592.
 

 Although this action was filed as a summary proceeding, the trial was not held until a year later due to the parties seeking and obtaining continuances.
 

 [4]
 

 . Colorado's wage payment statute provides the following exclusion: "(3) Nothing in this article shall apply to compensation payments due an employee under a profit-sharing plan, a pension plan, or other similar deferred compensation programs.” Colo.Rev.Stat. Ann. § 8-4-103
 

 [5]
 

 .
 
 See Herremans v. Carrera Designs, Inc., 157
 
 F.3d 1118, 1121 (7th Cir.1998)(holding under Indiana law that “[p]rofits are not wages, and neither is a fraction of profits wages; and so a bonus that is based on the performance of a plant rather than on the time or determinable output of the employee is not wages either”);
 
 see also Whitsell v. Bradshaw Ins. Group, Inc.,
 
 321 F.Supp.2d 983 (N.D.Ind.2004)(same).
 

 [6]
 

 . The Fifth Circuit in the
 
 Bell
 
 case expressly noted that the employees had not appealed the trial court's dismissal of their claims for a 2006 bonus.
 

 [7]
 

 . In so finding, we acknowledge that the evidence presented at trial in this case was not exactly the same as the evidence presented at trial in the
 
 Bell
 
 case. We note the Fifth Circuit in
 
 Bell
 
 in declining to follow the trial court's holding in this case likewise noted that ''[w]hile the facts of
 
 Kaplon
 
 do appear to be very similar to the instant case, this Court is unaware of the proof presented by the plaintiff to the court in
 
 Kaplon,
 
 thus we decline to rely on the holding in Kaplon to reverse the findings of the trial court in the instant matter.”
 
 Bell,
 
 09-343 at p. 5, n. 1,31 So.3d at 452.