ROLAND L. BELSOME, Judge.
|,This class action arises out of the mass reduction in force of the Orleans Parish School Board following Hurricane Katrina. After a bench trial on the merits, the trial court rendered judgment in favor of the plaintiffs and against the Orleans Parish School Board and the Louisiana Department of Education, jointly and solidarily, for compensatory damages. The judgment: 1) denied all peremptory exceptions filed by the defendants; 2) found that there was a due process violation which resulted in wrongful termination; 3) found that there was intentional and tortious interference of contract by the Louisiana Department of Education; and 4) found that the Orleans Parish School Board and the Louisiana Department of Education were partners, which created joint and solidary liability. Subsequently, the State Defendants and the Orleans Parish School Board sought this Court’s appellate review.
Upon careful consideration of all the assignments of error raised by the Appellants [1] and reviewing the record, this Court finds that the Appellees were |2deprived of their constitutionally protected property right to be recalled to employment without due process of law. This violation of due process was committed by the Orleans Parish School Board in failing to adhere to its policies in implementing the reduction in force and by the State through the Louisiana Department of Education by failing to follow the mandates of Act 35.

Facts and Legislative History

Effective November 6, 2003, an amendment to Article VIII, § 3(A) of the Louisiana Constitution authorized the Board of Elementary and Secondary Education (BESE) to take control of a public elementary or secondary school which has been determined to be failing.[2] In addition to *43 that amendment, the legislature enacted several statutes that defined what constituted a failing school and what procedure was to be implemented once a school was designated as |sfailing.[3] Also in 2003, the legislature enacted La. R.S. 17:1990, which created the Recovery School District (RSD), the entity that would manage the failing schools.[4]
The following year, the Louisiana Department of Education (LDOE) called for an audit of the Orleans Parish School Board (the Board) to account for the expenditure of approximately $70 million dollars in federal Title I funds. The audit revealed deficiencies in the Board’s accounting system and it was placed on “high-risk” status by the LDOE.[5] On June 9, 2005, the LDOE and the Board entered into a Memorandum of Understanding (MOU) outlining the purpose, parameters and goals for the Board. The primary focus at that time was to improve accounting, human resources, and financial management policies and procedures. In an effort to remedy the Board’s management and accounting deficiencies, the LDOE, through Superintendent Cecil Picard, hired Alvarez & Marsal (A & M), a New York based financial consulting firm. On July 16, 2005, A & M signed a two-year, $16.8 million contract. A & M’s consultant assigned to the Board was Bill Roberti.
Shortly after the beginning of the 2005-2006 school year, a mandatory evacuation was issued for the City of New Orleans, in preparation for Hurricane Katrina. On August 29, 2005, Hurricane Katrina struck the City of New Orleans, causing devastation to life and property. Due to the level of destruction in the City, hundreds of thousands of New Orleans’ citizens were displaced. The Board | immediately set up a call center for employees to provide contact information and have their questions answered.[6]
In September, 2005, the Board established a hotline to collect information regarding which employees were able to return to work and to determine which students would be returning to school. Meanwhile, Acting Superintendent of the Board, Dr. Ora Watson, along with the assistant superintendent, Darryl Kilbert, devised a plan to re-open fifty-two schools by the end of the 2005-2006 school year. At a meeting on September 15, 2005, Dr. Watson presented a formal proposal to the Board for the immediate opening of eight New Orleans public *44 schools in Algiers, an area that received only minimal damage during Hurricane Katrina. Inexplicably, no action was taken on that proposal. The Board determined that the best plan of action was to place its employees on “Disaster Leave Without Pay,” a classification, like many in this case, borne out of Hurricane Katrina.
During that period of time, Supt. Picard sought to have certain charter school policies and statutes waived and/or suspended. That request resulted in Governor Kathleen Blanco’s Executive Order No. KBB 2005-58 “Emergency Suspensions to Assist in Meeting Educational Needs of Louisiana Students.” On that same day, the Board voted to have thirteen public schools located in Algiers, including the eight that Dr. Watson proposed opening, converted to charter schools under a newly organized corporation, Algiers Charter Schools Association (ACSA). Meanwhile, the Board worked to locate qualified available teachers to reopen fifty-two New Orleans public schools.

\rACT 35

On November 30, 2005, the Louisiana Legislature enacted Act 35. Act 35 created La. R.S. 17:10.7, which allowed for the automatic transfer of failing schools to the Recovery School District (RSD), if that school was in a district that was “academically in crisis.” La R.S. 17:10.6(B) defined “academically in crisis” as “any local system in which more than thirty schools are academically unacceptable or more than fifty percent of its students attend schools that are academically unacceptable.” The overall result of the newly enacted legislation was that 102 -of 126 Orleans Parish public schools were transferred to the RSD.
Once Act 35 was passed, the Board determined that a reduction in force (RIF) was warranted. The employees previously placed on “Disaster Leave Without Pay” were sent notification advising them of their termination. During the course of these developments, this lawsuit was filed. The initial petition filed on October 28, 2005, sought a temporary restraining order and preliminary and permanent in-junctive relief to prevent the Board from converting New Orleans’ public schools to charter schools. A later filed amendment attempted to inhibit the Board from terminating their employees. Though the process was somewhat delayed, the employees were ultimately terminated effective March 24, 2006. At that time, this case evolved into a wrongful termination suit seeking damages. Later, the case was certified as a class action.
| Standard of Review
This Court reviews questions of law de novo, while questions of fact are considered under a manifestly erroneous/clearly wrong standard.[7] When mixed questions of law and fact are presented, this Court follows the manifest error standard.[8]

Wrongful Termination!Due Process Violation/The Board’s Liability

In its determination that the Appellees were wrongfully terminated, the trial court found that their due process rights were violated. The Board, in its defense, claims that the circumstances following Hurricane Katrina, more specifically the automatic transfer of a majority of the Board’s schools to the RSD pursuant to Act 35, warranted a reduction in force. We do not disagree that the Board was legally per *45 mitted to implement an RIF; our concern lies with whether the RIF was executed in accordance with the Board’s Policy.
The procedures for the implementation of an RIF are codified in La. R.S. 17:81.4. By way of 17:81.4, the Board was required to develop and adopt rules and policies that delegate RIF decisions. Pursuant to that mandate, the Board established Policy 4118.4, which dictates the procedures to be followed when implementing an RIF. Section D of the Board’s Policy is captioned “Recall” and reads in pertinent part:
Administrators[9] who have been reclassified, reduced in position, or laid off, because of an RIF shall be placed on a Recall List by job category. Seniority earned as of that time shall be maintained while affected by the |7RIF for two (2) calendar years. As vacancies occur, administrators shall be recalled in order of seniority.[10] (emphasis added).
Based on the clear language of the Board’s Policy, the Recall List is not optional, regardless of the circumstances surrounding the RIF. As the trial court found, evidence was produced that indicated information on more than 7,000 employees displaced by Hurricane Katrina had been compiled and used to identify employees that would be able to resume their employment as schools reopened. Yet, the names and other information were not used to create the mandated RIF Recall List. By failing to compose a recall list, the Board clearly violated its own Policy.
In order for due process to attach, the Appellees must prove a substantive right exists. Even though it is well established that a teacher’s right in employment is a statutorily created vested property right protected by federal and state constitutions, requiring that certain procedural steps are followed before a teacher is terminated,[11] there is very little jurisprudence on La. R.S. 17:84.1 and individual school board policies regarding the implementation of a RIF. As such, Louisiana courts have not made a legal determination regarding whether an employee’s right to recall is a substantive right.
However, the Illinois Supreme Court recently addressed this specific question in a similar case, Chicago Teachers Union v. Bd. of Educ.[12] In that case, budget deficits required the board to lay off approximately 1,300 teachers. Due to increased funding, more than half of the laid off teachers were rehired but many |8other positions were filled with new hires. The teachers union brought an action against the city board of education claiming due process violations for not considering laid off tenured teachers for rehire or giving them preference over new hires. The union maintained that Illinois law required that laid off teachers have recall rights. The district court agreed and the board appealed. The court of appeal certified the question to the Illinois State Supreme Court.
In response to the certified question, the Illinois Supreme Court found that the section of the School Code governing tenure *46 and rehire after layoff did not create a substantive right for the tenured teachers. In so ruling, the Court stated that property interests that are protected by due process are created and defined by state law, rules, or understandings that secure certain benefits. When the Court examined the School Code, it found that the legislature had removed mandated recall language from the sections that applied to the Chicago district and gave the power to designate layoff and recall procedures to the Board. Because there was no mandated recall procedure, the court found no basis for a substantive right to be rehired. The court did however acknowledge that state law mandated that laid off tenured teachers have a right to recall in all other school districts in Illinois. In sum, the court recognized that a substantive right can be created by state law or the Board’s rules, but neither was present for the Chicago district teachers.
Using the well-reasoned analysis of the Illinois Supreme Court, we are able to establish that the Appellees had a substantive right to be recalled. State law mandates that the Board create an RIF procedure and in doing so the Board intentionally included mandatory recall language. Once property interests are | ^created, they may not be removed without adequate legal process.[13] Thus, once the substantive right is established, due process attaches.[14]
In the instant case, the Appellees were entitled to, but not granted, the procedural protections of the Board’s Policy. A requirement of the Board’s Policy was that employees affected by an RIF had recall rights for two years.[15] In failing to create the Recall List, the Appellees lost the opportunity for employment for a minimum of two years. For these reasons we affirm the trial court’s finding of liability against the Board for violating the Appellees’ due process rights.

Tortious Interference of Contract and Partnership/The State’s Liability

Once the trial court found that the Board was liable to the Appellees, it further determined that the State was also liable to them under two separate theories of law:
The LDOE intentionally and tortiously interfered with the employment contracts and/or legally protected employment interests of the Plaintiff Class. As such, the LDOE is liable for tortious interference with contract, and answerable for the damages caused to the Plaintiff Class from such interference with their employment interests.
[[Image here]]
The defendants, the LDOE and the OPSB were partners in the management, control and administration of the New Orleans public schools and school system during the time when the wrongful termination of the Plaintiff Class occurred. As such, the Defendants are answerable, solidarity, for the damages caused to the Plaintiff Class from the wrongful termination which occurred during their partnership.
| wTortious Interference of Contract
The trial court relied on 9 to 5 Fashions v. Spurney,[16] in determining that the State had intentionally and tortiously interfered with the Appellees’ vested property rights *47 in continued employment. However, for the reasons that follow, we find that the Appellees failed to establish the necessary elements to prove a claim in tortious interference.
In 9 to 5, the Louisiana Supreme Court set forth five elements that must be proven to succeed in a claim for tortious interference of contract:
1) the existence of a contract or a legally protected interest between the plaintiff and the corporation;
2) the corporate officer’s knowledge of the contract;
3) the officer’s intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome;
4) absence of justification on the part of the officer; and
5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.[17]
In this case, the trial court found that Supt. Cecil Picard and Bill Roberti, neither of whom were named defendants, caused the Board’s funding and school properties to be transferred to the Recovery School District, which resulted in the Appellees’ termination. The trial court further found those actions to be an intentional and tor-tious interference with the Appellees’ vested property rights in their employment. In its analysis, the trial court determined that Supt. Picard owed a fiduciary duty to LDOE and the Appellees and by failing to distribute funds to |nthe Board, he breached that duty resulting in the Appellees’ termination.[18] Lastly, the trial court determined that these actions were taken without authority or justification.
In order to find that there was a tortious interference of contract, all five elements must be proven. In our discussion of the wrongful termination, we acknowledged that the Appellees had a vested property right in their employment. However, we also recognized that the right is not absolute.[19] There, we found that La. R.S. 17:81.4 together with the Board’s Policy, 4118.4, provided the authority to implement an RIF. In the same manner, we find that ACT 35, La. R.S. 17:10.5 et seq. and La. R.S. 17:1990 provided the State with the power and authority to transfer, funding and facilities to the RSD. Therefore, the trial court’s determination that Supt. Picard’s actions were unauthorized and unjustified is clearly wrong, which defeats the tortious interference with contract claim.
We do however find that even though the State had the authority to take these actions, they were statutorily mandated to give priority consideration to the certified teachers that taught in the failing schools prior to the schools being transferred. La. R.S. 17:1990(D)(1) provides that:
At the time of the transfer of a school to the school district [RSD], any certified teacher with regular and direct responsibility for providing classroom instruction to students who is employed in the transferred school by the prior system shall be given priority consideration for employment in the same or comparable position by the school district, (emphasis added).
*48 There is absolutely no evidence that qualified Appellees were provided the consideration mandated by the statute. To the contrary, the record clearly shows [,2that the State advertised for these positions nationally and contracted with Teach for America to hire inexperienced college graduates that did not have teacher certification. The statutory requirement establishes the procedural due process owed to qualifying teachers from the transferred schools. By not following that mandate, the State, through the RSD, violated the constitutional due process rights of those teachers, resulting in their loss of opportunity for continued employment.

Partnership

The trial court found that the defendants created a contractual partnership when they signed a “Memorandum of Understanding’’ (MOU). Although the preamble of the MOU mentions a partnership, it does not demonstrate the elements required by La. C.C. art. 2801.[20] Furthermore, La. Const, art. VIII § 3 mandates the parameters of the State entities’ functions as they pertain to local school boards and clearly prohibits State interference with the business affairs of local school districts.
The use of the word “partnership” in the MOU between the State entities and the Board does not create the relationship necessary to find a legal partnership as defined by LCC art. 2801 where State entities and the Board “combine their efforts [and] ... collaborate at mutual risk for their common profit.” The trial court determined that the language in the Statement of Purpose section of the MOU established a relationship analogous to the partnership described in La. C.C. art. 2801.
11sThe MOU established that the Board had the duty to fund the “external vendor,” but any further distribution of risk, profits, or losses between the State and the Board is absent from the MOU. The State agreed to select the vendor, provide guidance, assign staff, review vendor invoices, and receive reports from the Board and the external vendor. The State entities are constitutionally bound to supervise and control schools. Therefore, the MOU clarifies the specific roles of State entities, but does not demonstrate intent to exceed this duty and share risks or profits with the OPSB.
The trial court relies on Gabriel v. Hobbs[21] to overcome the lack of risk and profit sharing required by the Civil Code, stating that an agreement may create a partnership even if the parties did not intend the legal consequences. However, the language in Gabriel states that the parties must “enter into an agreement the law defines as partnership.”[22] As previously discussed, the intent to share risk and profit is an impetus for a partnership under La. C.C. art. 2801, not a consequence. The MOU does not contain language sufficient to demonstrate this motivation and therefore cannot prove a partnership defined by law.
Additionally, the State entities’ right of control was limited to the functions set forth in La. Const. Art. VIII § 3(A). The MOU clarifies the State entities’ duties to *49 the Board, but these are confined to the State’s constitutional functions: supervision and control.[23] Thus, the State entities were constitutionally prohibited from interfering with the business affairs of the Board, including removal of employees.
| uThe trial court erred when it determined that the MOU created a legal partnership between the State and the Board. Accordingly, we reverse the court’s ruling regarding partnership.

Damages

The trial court awarded five elements of damage to the Appellees: 1) lost wages; 2) benefits and emoluments; 3) accumulated annual leave; 4) state supplemental pay (where applicable); and 5) reimbursement of difference between health insurance procured during the period of wrongful termination.
The Appellants disagree with the award of any damages to the Appellees. However, if damages are to be awarded, the Appellants assert several errors in the trial court’s calculation of damages. First, the trial court’s reasons for judgment indicate that it agreed that any lost wage claim should be reduced by the amount of unemployment compensation received by each Appellee, yet it failed to make any such adjustment. That reduction would also have an overall effect on the amount of fringe benefits awarded. Additionally, only employees that participated in the health insurance plan prior to termination should be eligible for the fringe benefit award. The last argument is that there was no evidence to establish that five years of back pay was appropriate compensation for the Appellees’ damages. For the following reasons, we find the Appellants’ arguments have merit and adjust the damages award accordingly.
In its award of damages, the trial court adopted the calculations of Appellees’ expert, Forensic Economist Dr. Shael Wolf-son. Dr. Wolfson’s methodology took into account earnings information, tax returns, W2s, and pay 11fiscale information for the terminated employees. Based on that information, Dr. Wolfson calculated five years of back pay and fringe benefits. He testified to first establishing a pay rate for the time period in question, then applied incremental increase of 5.14 percent annually to the base rate to project the back pay. Next, he determined that the fringe benefits were 25 percent of the established back pay amount. He further testified that adjustments were made to account for income earned during that time from other employment. We do not find error with the trial court’s acceptance of Dr. Wolf-son’s general methodology and use of a 5.14 percent annual increase to calculate back pay and the 25 percent value for fringe benefits.
However, as discussed in Dr. Wolfson’s cross-examination, and the direct examination of Appellants’ expert, Forensic Economist Dr. Kenneth Boudreaux, damages for fringe benefits should be reduced for employees who did not participate in the benefit during their employment.[24] Additionally, as stated by Dr. Boudreaux and the trial court, adjustments in calculation need to be made for unemployment benefits received, just as other income was deducted from the lost wages. Accordingly, we find the calculation of annual lost wages, when applying the appro *50 priate deduction, is supported by the record.
Lastly, the Appellants contend that the trial court erred in awarding five years of back pay and fringe benefits, and we must agree. The record in this case gives no reasonable factual basis to support a five year award. In accordance with this Court’s findings that the Board’s implementation of the RIF deprived the hr,Appellees of their constitutionally protected property right without due process of law, the Board is liable to the Appellees for two years[25] of back pay and fringe benefits.[26] This Court further found that the State was hable for a violation of due process for failing to give eligible teachers hiring priority when staffing the schools transferred to the RSD in accordance with La. R.S. 17:1990(D)(1).[27] The requirement for priority consideration is an ongoing duty created by the legislature and at the time of trial the obligation had still not been fulfilled. However, for the purposes of damages, we find that the teachers who would have met the criteria of La. R.S. 17:1990(D)(1) are due an additional one year of back pay and fringe benefits to be paid by the State subject to all applicable deductions.[28]

Res Judicata

In the trial court, the State Appellants and the Board filed exceptions of res judi-cata.[29] After hearing oral arguments and accepting post hearing briefs, the trial court denied the exceptions. Writs were subsequently taken to this Court and the Supreme Court, and both courts denied the writs. The Appellants have again raised the issue of res judicata on appeal.
117The Appellants seek this Court’s review of whether an' arbitration settlement and subsequent dismissal of several similar pending lawsuits has a preclusive effect on this litigation.[30] During the time that this litigation was pending, the teachers Union, through two filings of Petitions for Declaratory Judgment, was pursuing claims arising from the termination of tenured and non-tenured employees.[31] In addition to those court filings, the Union submitted *51 several complaints through their contractually provided grievance procedure. The grievances were not resolved and were converted to arbitrations.
The record before this Court indicates that there were a total of six arbitrations. Three of the arbitrations,[32] citing certain violations of the Collective Bargaining Agreements,[33] were brought before an arbitrator. Considering the merits of those specific violations, the arbitrator found in favor of the Union.[34] In 11sresponse to the arbitrator’s opinion and award, the Union filed a Petition to Modify or Vacate Arbitrator’s Award pursuant to La. R.S. 9:4210.[35]
Later, a settlement was reached by the Union and the Board for $7,000,000[36] in consideration for the remaining arbitra-tions[37] relating to other grievances filed over violations of the Collective Bargaining Agreement.[38] In addition to settling those arbitrations, the Union agreed to dismiss with prejudice the petition filed in Orleans Parish asserting that the Board violated La. R.S. 17:461, 462, and 522, dismiss with *52 prejudice the Board as a named party from the constitutional challenge to Act 35, and dismiss with prejudice the Petition to Modify or Vacate Arbitrator’s award. Notably, the Board did not seek to have the instant litigation, which was pending at the time of settlement, dismissed.[39]
| i9Ordinarily, judicial proceedings afford preclusive effect to arbitrations that have already adjudicated the same claims or defenses.[40] However, as previously stated, the only claims that actually went before an arbitrator and resulted in an award involved contractual violations relating to health insurance payments and the circumventing of the bargaining agreement when staffing charter schools. The remaining grievances relating to other provisions of the Collective Bargaining Agreement resulted in the three arbitrations that were compromised in the Settlement Agreement.[41]
When addressing employment lawsuits, courts have been critical of union proceedings waiving or barring an employee’s right to seek judicial review of claims arising out of state and/or federal statutes.[42] The U.S. Supreme Court has recognized the “ ‘deep-rooted historic tradition that everyone should have his own day in court.’ ”[43] Further, the Louisiana Supreme Court has recognized that “[wjhile res ju-dicata is a useful tool, it should not be used as a scythe applied mechanically to mow down claims where the party asserting the claim is not at fault for the lack of adjudication of that claim in the first suit.”[44]
Likewise, this Court has acknowledged that “[t]he overruling of an exception of res judicata will lessen judicial efficiency and increase the need for | snlitigation”; however, “[tjhose harms are sometimes preferable to the loss of plaintiffs substantive rights without the merits being decided.” [45] As this Court recognized in Fine, La. R.S. 13:4232(A) provides the following exceptions to the rule of res judicata:
A. A judgment does not bar another action by the plaintiff:
(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;
*53 (2) When the judgment dismissed the first action without prejudice; or,
(3) When the judgment reserved the right of the plaintiff to bring another action, (emphasis added)
Thus, La. R.S. 13:4232(A)(1) “provides discretion to decline preclusion” and “lends authority to the notion of not using the res judicata ‘scythe’ to deny a litigant his rights.”[46] In Fine v. Reg’l Transit Auth., this Court considered whether exceptional circumstances existed such that res judica-ta would not apply to bar a subsequent action. The facts and procedural history of the case were summarized by this Court as follows:
On March 25, 1993 Dr. Fine’s vehicle was struck by a Regional Transit Authority (RTA) bus driven by J.W. James. State Farm Mutual Automobile Insurance Company, the insurer of Dr. and Mrs. Lisa Fine, filed suit (subrogation claim) naming itself and the Fines as plaintiffs and RTA and James as defendants. The petition requested: $991.11 for State Farm, the amount it had paid the Fines (evidently for property damages); and $250 for the Fines (evidently the amount of the Fines’ deductible). Subsequently the Fines and State Farm filed a motion and order of dismissal which provided that “all claims and demands presented herein have been amicably settled and |⅞1 compromised; and, that accordingly plaintiffs desire a dismissal of the entire action, with prejudice, and with the parties to bear their own costs.” The trial court signed the dismissal on November 2,1993.
On March 11, 1994 Dr. Fine filed a petition for damages against RTA and James for personal injuries, medical expenses, mental anguish, and past and future loss of earnings. Mrs. Fine claimed loss of consortium although she was not a named plaintiff. RTA and James answered and reconvened alleging Dr. Fine’s negligence, but subsequently dismissed the reconventional demand without prejudice. RTA and James then filed an exception of res judicata, which was maintained.[47]
This Court found that “Dr. Fine’s alleged damages for personal injuries were not litigated or settled and La. R.S. 13:4231(3) does not support res judica-ta.” [48] Noting that State Farm took no action to preserve the Fines’ claims by a reservation of rights, this Court determined that exceptional circumstances warranted the application of La. R.S. 13:4232, holding that “[t]he loss of Dr. Fine’s substantive right for damages for physical injuries resulting from the auto accident without being decided on the merits outweighs the need for judicial economy and for protection against the burdens of litigation,” and therefore, res judicata did not bar the personal injury action.[49]
In reaching this conclusion, the Fine Court also acknowledged that the Third Circuit had applied La. R.S. 13:4232, noting that “[a]n insurance company’s failure to provide the policy at issue until a few days before trial so that plaintiff was unaware of a medical payments provision and could not seek to enforce the provision or *54 ask for penalties and attorney’s fees for non-compliance in her personal injury suit has been held to constitute exceptional circumstances under |j>aLa. R.S. 18:4232(1).”[50] This Court recently cited Fine and Brouil-lard, recognizing that “[a] review of the jurisprudence also reflects that several courts have denounced the application of res judicata principles when the issues in the subject cases were never settled, litigated, or adjudicated.”[51]
In Igbokwe, Linus Igbokwe and Joshua Moser were involved in an automobile accident. Linus and Terralene Igbokwe filed a petition, asserting that Moser was at fault and that the accident occurred while Moser was in the course and scope of his employment with Southbrook Christian Church. The petition also named South-brook and its insurer, Erie, as defendants. Southbrook and Erie were properly served, but Moser, a resident of Ohio, was not served, and the trial court dismissed the plaintiffs’ claims against Moser without prejudice. The plaintiffs did not appeal that judgment.
Thereafter, the plaintiffs filed a second petition for damages, naming Joshua Mos-er as the sole defendant. The second petition was docketed with the same district court case number as the original petition, however, and was date stamped on March 28, 2008, the date the original petition was filed. Moser was properly served with the second petition. Moser filed various exceptions, including prescription and insufficiency of service of process, and the trial court granted the | ^exceptions, dismissing all claims against Moser with prejudice. That judgment was affirmed on appeal.
Southbrook and Erie subsequently filed a motion for summary judgment and/or exception of res judicata, contending that because Moser had been dismissed with prejudice, there was no basis to hold Southbrook liable under the doctrine of respondeat superior, nor any basis for an action against Erie, as the insurer. The trial court granted the motion for summary judgment and/or exception of res judicata and dismissed the plaintiffs’ claims against Southbrook and Erie with prejudice.
This Court reversed the trial court’s judgment, holding that res judicata did not apply, specifically relying upon its reasoning in Fine:
In Fine, this Court also recognized that the doctrine of res judicata should not apply where a plaintiff’s alleged damages for personal injuries were not litigated or settled. Therein, we stated that “[t]he overruling of an exception of res judicata will lessen judicial efficiency and increase the need for litigation. Those harms are sometimes preferable to the loss of plaintiffs substantive rights without the merits being decided.” Applying these precepts to the case before us, we find that res judicata does *55 not apply. The dismissal of Moser on procedural grounds, where no determination was made as to Moser’s negligence, should not bar plaintiffs from continuing to pursue Southbrook and Erie, both of which were properly and timely served in this action.[52]
Thus, this Court “conclude[d] that a rigid application of res judicata to the facts of [the Igbokwe ] case [wa]s not warranted.” Id.
This Court also applied La. R.S. 13:4232 to bar res judicata in Simmons v. Baumer Foods, Inc.[53], recognizing that “the comments accompanying La. Rev.Stat. 12413:4232 make clear that this court has the authority under the statute to exercise its equitable discretion to balance the principle of res judicata with the interests of justice, although clearly ‘this discretion must be exercised on a case by case basis and such relief should be granted only in truly exceptional cases....’”[54]
Here, even though the Union settlement may support preclusion under normal circumstances, the matter sub judice represents a truly exceptional situation as to warrant this Court’s discretion in barring the application of res judicata pursuant to La. R.S.13:4232. Just as in the cases discussed, we are presented with plaintiffs asserting claims that have not previously been litigated or adjudicated.
Through the enactment of Act 35 the legislature gave the State the authority to implement the unprecedented takeover of the majority of Orleans Parish ^schools. To further undermine the Orleans Parish schools and employees, Supt. Picard successfully persuaded Governor Blanco to *56 suspend charter school policies and legislation allowing for a number of schools that the Board planned on opening to be converted to charter schools. The result was that 7500 employees, the individuals represented in this lawsuit, lost their jobs. Then, subsequent to the layoff and in violation of the Board’s policy and the State’s statutory requirements, the Appellees were denied their rights to be recalled to employment.
We find this case worthy of exercising this Court’s authority under the statute to apply equitable discretion in balancing the principle of res judicata with the interests of justice. It would be inequitable, unjust, and illogical for this Court to find that the minimal consideration received by the employees through the Union settlement would bar or waive their right to have their claims litigated and adjudicated through judicial proceedings. As previously stated, the Board was fully aware that this case was pending prior to the Union settlement and did not seek dismissal at that time. For these reasons, we find no error in the trial court’s denial of the exceptions of res judicata.

Prescription

The State Appellants and the Board contend that the Appellees’ claims for wrongful termination are prescribed by law. The trial court rejected this argument denying the previously filed exceptions of prescription. For the reasons that follow, we find that the trial court was correct in its denial of the exceptions.
The Appellees filed the following petitions:
1) October 28, 2005-Petition for In-junctive and Declaratory Relief 12r,naming the Board as the defendant and seeking a temporary restraining order and preliminary and permanent in-junctive relief to prevent the Board from violating the teacher’s legal rights to employment.[55]
2) November 3, 2005-First Amending and Supplemental Petition In addition to the demands of the original petition, the Appellees sought to enjoin the Board from establishing and implementing Charter School Districts.[56]
3) January 31, 2006-Second Amending and Supplemental Petition naming the State of Louisiana as a defendant.[57]
4) July 26, 2006-Third Amending Petition, again adding the State as a defendant and additionally naming Board of Elementary and Secondary Education and the Louisiana Department of Education as defendants.[58]
*57 5) March 23, 2007-Fourth Amending and Supplemental Petition to request damages for wrongful termination.
6) April 16, 2010-Fifth Amending Petition, asserting claims that the 127State and the Board were joint and solidary tortfeasors in the plaintiffs’ wrongful termination and the State Defendants were liable for damages.[59]
On appeal, the State Appellants and the Board seek this Court’s review of their exceptions of prescription. The State Defendants and the Board contend that the Board’s letter, sent February 22, 2006, notified the plaintiffs of the upcoming termination effective March 24, 2006 and thus all claims for wrongful termination prescribed on February 22, 2007.[60] Therefore, the Board’s contention is that the Fourth Amending Petition, filed on March 23, 2007, was prescribed as a matter of law. The Appellees respond by claiming relation back of the Fourth Amending Petition to the original Petition pursuant to La. C.C.P. art. 1153 which serves to interrupt prescription.
An action for wrongful discharge or termination is a delictual action, which is prescribed one year from the day injury or damage is sustained.[61] Prescription begins to run when damage to the plaintiff has manifested itself with sufficient certainty to support accrual of a cause of action.[62] The fundamental purpose of prescription statutes is to afford a defendant economic and psychological security if no claim is made timely and to protect the defendant from stale claims and from the loss or non-preservation of relevant proof.[63] The filing of suit in a court of competent jurisdiction interrupts prescription.[64]
| ^Generally, the burden of proof rests with the party pleading prescription.[65] However, if the claim is prescribed on its face, the burden then shifts to the plaintiff to negate the presumption by establishing a suspension or interruption.[66] La C.C.P. art. 1153, when applicable, serves as an interruption to prescription.
Article 1153 provides that when the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading.[67] The standard controlling review of a peremptory exception of prescription requires that this court strictly *58 construe the statutes against prescription and in favor of the claim that is said to be extinguished.[68] Accordingly, because Article 1153 serves as an interruption to prescription, it too should be liberally applied, particularly in the absence of prejudice.[69]
The standard asserted in Article 1153 is broad; if the claims in the amendment arise “out of the conduct, transaction, or occurrence” originally asserted then the doctrine applies. In interpreting Article 1153, Louisiana courts have taken a case by case approach focusing on fair notice.[70] Previously, this court has held that if comparison of the amended petition to the original petition shows that the original petition gave fair notice of the factual situation out of which the amended petition arose, the amended petition will relate back to the date of filing |29of the original petition; it makes no difference that the amended petition seeks additional relief.[71] This is particularly true where the original petition is stated in broad terms that would put the defendant on notice that the factual situation might lead to more than one different cause of action.[72]
In the instant case, the Appellees gave a broad accounting of the factual scenario that gave rise to the causes of action in their original petition. Although the original petition is one for injunctive and declaratory relief to prevent the OPSB from establishing charter schools, the petition consistently referenced the plaintiffs’ right to maintain their employment along with the effects of mass termination.[73] *59 Under these circumstances, it would be a clear contradiction to the applicable jurisprudence to find that the Fourth Amending Petition did not relate to |snthe original petition given the notice of the general factual situation out of which the claim for wrongful termination developed.
Additionally, the State maintains that even if the Fourth Amending Petition is found to be timely, the Fifth Amending Petition filed in 2010 is undoubtedly prescribed and cannot relate back. More specifically, the State argues that prior to the filing of the Fifth Amending Petition, the cause of action against the State was intentional interference with contract, not wrongful termination and that the two causes are wholly unrelated, and thus allowing the amendment to relate back under Article 1153 would be highly prejudicial. They further argue that the allegation of solidary liability between the State and the Board cannot relate back because it asserts a new theory and factual scenario. We disagree.
The State was first named as a defendant in the Second Amending Petition, but was subsequently dismissed by the plaintiffs who reserved the right to bring the State back in at a later date should the litigation reveal facts that would show the State to be liable. The State was renamed as a defendant in the Third Amending Petition filed on July 26, 2006. The State was timely named as a defendant to the suit and had fair notice of all the facts, circumstances, and allegations set forth by the Appellees. Through the Third Amending Petition, the State was aware that judicial relief was being sought for the firing of the plaintiffs, and thus the claim for wrongful termination asserted in the Fifth Amending Petition and the allegations directly arise out of the same transaction, occurrence and conduct that support a claim of intentional interference with the teachers’ employment contracts and the effects of Act 35.
Louisiana jurisprudence provides that where an amended petition that simply adds a new claim based on the same factual situation as the claim set forth in the | si original petition, and both claims are made against the same defendant, the filing of the amendment relates back to the date of the filing of the original petition.[74] Likewise, this Court has allowed an amended petition setting forth a new legal theory of recovery against an existing defendant, if the amended pleading does not add any new factual allegations that had not already been called to the defendant’s attention.[75]
In Rivard v. Petroleum Transport Co., Inc.,[76] this Court held that a defendant who was already alleged to be liable in a lesser capacity could not plead prescription when the plaintiff later filed a supplemen *60 tal petition alleging solidary liability.[77] The original petition in Rivard set forth the factual situation in which the claim arose, and even though the capacity of the insurer changed through an amending petition, the facts of the claim remained the same. This Court reasoned that in applying the liberal application of Article 1153, amendments should relate back whether “a new and independent cause of action is pleaded, the amendment entirely changes the legal theory of the action, adds another claim arising out of the same occurrence, changes the capacity of the parties, adds or drops parties.”[78] Since the action was brought under the same policy and the insurer was put on notice of the death claim from the original petition, this Court allowed the amendment to relate back.
|S2Similarly, in this case, allegations that the State and the Board are solidarily liable for the wrongful termination of the school board employees simply changes their capacity in a suit of which they were already a part. Allowing the Fifth Amending Petition does not violate the State’s right to fair notice and Appellants have failed to prove that the State was prejudiced by the amendment. Therefore, we find the State’s exception of prescription was correctly denied.

Conclusion

On appeal, this Court:
1) Affirms the trial court’s ruling that the Appellees’ right to due process was violated;
2) Reverses the trial court’s findings of tortious interference of contract, partnership, and solidary liability;
3) Affirms the trial court’s denial of all peremptory exceptions; and
4)Amends the award of damages in three respects:
a) The Orleans Parish School Board is liable to the Appellees, as a class, for two years of back pay and fringe benefits;
b) The State is liable to teachers meeting the criteria of La. R.S. 17:1990(D)(1) for an additional one year of back pay and fringe benefits; and
c) Annual calculations must be adjusted to reflect the applicable deductions discussed in this opinion.
The matter is remanded for further proceedings in accordance with this opinion.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

. The following assignments of error were raised by the appellants and considered in rendering this opinion: 1.) the trial court erred in denying the State Appellants’ exception of no cause of action; 2.) the trial court erred in finding that the LDOE and OPSB were liable for wrongful termination; 3.) the trial court erred in denying the State Appellants’ and OPSB’s exceptions of prescription; 4.) the trial court erred in denying the State Appellants’ and OPSB’s exceptions of res judi-cata; 5.) the trial court erred in its calculation of damages; 6.) the trial court erred in finding that the LDOE and OPSB are solidarity liable to the plaintiffs; and 7.) the trial court erred in denying the OPSB’s post-trial motion to de-certify.

. The amendment provided:
(A) Creation; Functions. The State Board of Elementary and Secondary Education is created as a body corporate. It shall supervise and control the public elementary and secondary schools and special schools under its jurisdiction and shall have budgetary responsibility for all funds appropriated or allocated by the state for those schools, all *43 as provided by law. The board shall have other powers, duties, and responsibilities as provided by this constitution or by law, but shall have no control over the business affairs of a city, parish, or other local public school board or the selection or removal of its officers and employees: however, the board shall have the power to supervise, manage, and operate or provide for the supervision, management, and operation of a public elementary or secondary school which has been determined to be failing, including the power to receive, control, and expend state funds appropriated and allocated pursuant to Section 13(B) of this Article, any local contribution required by Section 13 of this Article, and any other local revenue available to a school board with responsibility for a school determined to be failing in amounts that are calculated based on the number of students in attendance in such a school, all in the manner provided by and in accordance with law. La. Const. Art. VIII, § 3(A).

. La. R.S. 17:10.5 et seq.

. The statute authorized funding and facilities to be transferred to the RSD.

. The "high risk” status was a result of an unsatisfactory audit of Title I funds conducted by the U.S. Department of Education, Office of Inspector General.

. The record indicates that approximately 7,000 names and updated addresses were received through the call center.

. Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507.

. Kaplon v. Rimkus Consulting Group, Inc. of La., 09-1275 (La.App. 4 Cir. 4/28/10), 39 So.3d 725.

. Administrators are defined by the policy as "certificated and non-certificated personnel not represented by a Bargaining Unit ...” However, the Board was also bound and obligated to this policy pursuant to the Union Bargaining Agreements.

. This language is consistent with the language set forth in the RIF sections of the UTNO Bargaining Agreements mandating that layed-off employees be placed on a recall list for two years.

. U.S.C.A. Const.Amend. 14; LSA-Const. Art. 1, § 2; LSA-R.S. 17:443.

. 2012 IL 112566, 357 Ill.Dec. 520, 963 N.E.2d 918 (111.2/17/12); See also, Clukey v. Town of Camden, supra.

. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

. Id.

. Policy 4118.4(D).

. 538 So.2d 228 (La.1989).

. Id. at 234.

. The trial court also found that Mr. Roberti controlled the Board's finances and breached his duty to the Appellees.

. See, Rousselle v. Plaquemines Parish School Board, 93-1916 (La.2/28/94), 633 So.2d 1235.

."A partnership is a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit.” La. C.C. art. 2801.

. 2001-0538 (La.App. 4 Cir. 12/19/01), 804 So.2d 853.

. Id. at p. 3, 804 So.2d at 855.

. La. Const. Art. VIII, § 3(A).

. The scenario presented to Dr. Wolfson during cross-examination was employees who did not participate in health insurance benefits. Dr. Wolfson suggested that the 25 percent calculation for fringe benefits would have to be reduced under those circumstances.

. As previously discussed, Orleans Parish School Board Policy 4118.4(D) and the Union Bargaining Agreements, required that employees remain on a recall list for two calendar years.

. The annual amount of back pay shall be calculated using Dr. Wolfson's percentages and applying appropriate deductions discussed in this opinion.

. "At the time of the transfer of a school to the school district [RSD], any certified teacher with regular and direct responsibility for providing classroom instruction to students who is employed in the transferred school by the prior system shall be given priority consideration for employment in the same or comparable position by the school district.” La. R.S. 17:1990(D)(1) (emphasis added).

. The calculation is for one independent year with no application of the 5.14 percentage annual increase.

. The doctrine of res judicata precludes subsequent litigation when all of the following are satisfied: 1) the judgment is valid; 2) the judgment is final; 3) the parties in the two matters are the same; 4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and 5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. Burguieres v. Pollingue, 02-1385, p. 8 (La.2/25/03), 843 So.2d 1049, 1053; La. R.S. 13:4231.

. Plaintiffs in this litigation assert claims which include, but are not limited to, violations of plaintiffs’ employee rights under La. R.S. 17:461-62, and 17:522.

. United Teachers of New Orleans, et al v. State Board of Elementary and Secondary Education, et al, 07-0031 (La.App. 1 Cir. 3/26/08), 985 So.2d 184 (challenging the constitutionality of Act 35); and United Teachers of New Orleans, et al v. Orleans Parish School Board, *51 Civil District Court for the Parish of Orleans, No. 06-906 (asserting claims that the plaintiffs’ employment rights pursuant to La. R.S. 17:461-62, and 17:522 had been violated).

. AAA Case No. 69 390 L02011 06; AAA Case No. 69 390 L02017 06; and AAA Case No. 69 390 L02022 06.

. Those claims were: 1) Beginning in June 2005, the Board failed to make payments to the Health and Welfare Fund in compliance with Article 44:1 and 44:4 of the Agreement; 2) The Board failed to comply with Article 42:1, 42:2 and 42:4 of the Agreement when it unilaterally reduced the benefits of the group Hospitalization insurance plan and increased the premiums for which it held employees responsible; and 3) In contravention of Article 1:2, Board entered into contracts with a certain private entity, the Algiers Charter School Association, for the purpose of creating and operating charter schools in pre-exist-ing Orleans Parish schools. The charters create positions identical to the employment classifications within the bargaining unit, but bar collective bargaining.

. The arbitrator found that the board had violated sections of article 44 relating the Health & Welfare Fund, which required the Board to expend $790 per employee toward the Fund. Additionally, he found the Board also violated Article of the Agreements by staffing charter schools outside of the Agreement and/or by preventing members of the union to be named employees of the charter schools.

. That statute provides: Motion to vacate award; grounds; rehearing
In any of the following cases the court in and for the parish wherein the award was made shall issue an order vacating the award upon the application of any party to the arbitration.
A. Where the award was procured by corruption, fraud, or undue means.
B. Where there was evident partiality or corruption on the part of the arbitrators or any of them.
C. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced.
D. Where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
Where an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

. Each Union member received $1,000 in settlement proceeds.

. AAA Arbitration No. 69 300 12523; AAA Arbitration No. 69 300 12541; and AAA Arbitration No. 69 300 12514.

. Those grievances addressed the Board’s violations regarding Emergency Leave, Layoff, and Natural Disaster pay.

. The defined class in this case includes employees who were part of the Union settlement.

. See, Sheet Metal Workers International Association Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc., 673 F.Supp.2d 313, 320 (D.N.J.2009).

. The Settlement Agreement clearly states the $7,000,000 represents settlement of the arbitrations listed within the document. Additionally, the record is void of anything that would suggest these arbitrations were heard by or ruled on by an arbitrator.

. See, Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) and Clukey v. Town of Camden, 717 F.3d 52 (1st Cir.2013).

. Richards v. Jefferson Cnty., Ala., 517 U.S. 793, 798, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996)(quoting Martin v. Wilks, 490 U.S. 755, 761-762, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989))(citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)).

. Terrebonne Fuel & Lube, Inc. v. Placid Ref. Co., 95-0654, pp. 19-20 (La.1/16/96), 666 So.2d 624, 635; see also M. David Kurtz and Mark W. Frilot, Res Judicata in Louisiana: A Synthesis of Competing Interests, 53 La. B.J. 445 (2006).

. Fine v. Reg'l Transit Auth., 95-2603, p. 5 (La.App. 4 Cir. 6/26/96), 676 So.2d 1134, 1137 (citing Mavromatis v. Lou-Mar, Inc., 93-0379, 93-1212 (La.App. 4 Cir. 2/11/94)), 632 So.2d 828; see also Glass v. Alton Ochsner Med. Found., 2002-0412 (La.App. 4 Cir. 11/6/02), 832 So.2d 403, 413 (noting that "in a case involving res judicata ... this Court made the point that the principle of judicial economy is not always of paramount importance”)(citing Fine, 95-2603, 676 So.2d at 1137).

. Kurtz and Frilot, supra, 53 La. B.J. at 449 (citing Arwood v. J.P. & Sons, Inc., 99-1146 (La.App. 5 Cir. 2/29/00), 759 So.2d 848, 850); see also Fine, 96-2603, p. 4, 676 So.2d at 1136 (noting that "the statute gives a court the authority to exercise its equitable discretion to balance the principle of res judicata with the interests of justice”)(citing Jenkins v. State, 615 So.2d 405, 406 (La.App. 4 Cir.1993)).

. Fine, 95-2603, pp. 1-2, 676 So.2d at 1135.

. Id. at p. 5, 676 So.2d at 1137.

. Id. at pp. 5-6, 676 So.2d 1134.

. Fine, 95-2603, pp. 4-5, 676 So.2d at 1136 (citing Brouillard v. Aetna Casualty & Surety Company, 94-1559 (La.App. 3 Cir. 5/10/95), 657 So.2d 231). Accordingly, "[c]onvoluted factual or legal scenarios have qualified as exceptional circumstances to justify the exception [to res judicata].” Kurtz and Frilot, supra, 53 La. B.J. at 449 (citing Brouillard, 94-1559, 657 So.2d at 233).

. Igbokwe v. Moser, 2012-1366, p. 6 (La.App. 4 Cir. 4/24/13), 116 So.3d 727, 731 writ denied, 2013-1196 (La.9/13/13), 120 So.3d 698 (citing Fine v. Regional Transit Auth., 95-2603 (La.App. 4 Cir. 6/26/96), 676 So.2d 1134, 1137; Schneidau v. Vanderwall, 08-1274, pp. 5-6 (La.App. 5 Cir. 5/26/09), 17 So.3d 61, 64 [51] (citing Billiot v. LeBeouf Brothers Towing Co., 93-1697 (La.App. 1 Cir. 6/24/94), 640 So.2d 826); Ortiz v. Ortiz, 01-1252, pp. 5-6 (La.App. 5 Cir. 05/15/02), 821 So.2d 35, 38; and Brouillard v. Aetna Cas. and Surety Co., 94-1559, p. 3 (La.App. 3 Cir. 5/10/95), 657 So.2d 231, 233).

. Igbokwe, 2012-1366, p. 7, 116 So.3d at 732. (citations omitted).

. In Simmons, this Court determined that exceptional circumstances existed and that it was in the interest of justice to apply La. R.S. 13:4232:
The circumstances of this case are clearly exceptional. It has been judicially determined that the decedent was a borrowed employee but that her claims do not fall under the Workers’ Compensation Act. The plaintiffs initially filed a tort action in civil district court but were diverted into the workers' compensation system. Now that it has been decisively determined that decedent was an employee and that the plaintiffs’ claims do not fall under the Workers' Compensation Act, the defendants argue that the doctrine of res judicata should be applied to deny the plaintiffs their day in court. Notably, the plaintiffs have vigorously pursued their claims but the substance of their tort claims and the issue of whether those claims fall beyond the scope of the Workers’ Compensation Act have yet to be addressed. Rather, their pursuit of justice has been derailed by the procedural determinations as to whether their action should be heard in civil district court or workers’ compensation court. Accordingly, now that it has been definitively determined that the plaintiffs’ action is properly brought in civil district court, it would be unjust to bar them from an opportunity to litigate the substantive issues. Under the exceptional circumstance of this case, we find that relief from the res judicata effect of the prior judgments sustaining the Exceptions of No Cause of Action filed by Baumer, Task Force, and National Union (alleging that the plaintiffs’ claims were barred by the exclusivity provisions of the Louisiana Workers’ Compensation Act) is justified. With regard to the plaintiffs' claims against American Zurich, there appears to be no dispute that the plaintiffs’ claims against Baumer do not fall within the terms of American Zurich’s CGL policy with Bau-mer and, accordingly, we affirm the summary judgment rendered in favor of American Zurich.
Simmons, 2009-1739, pp. 8-9, 55 So.3d at 793-94.

. Simmons v. Baumer Foods, Inc., 2009-1739, p. 5 (La.App. 4 Cir. 10/6/10), 55 So.3d 789, 792, writ denied, 2010-2495 (La.1/14/11), 52 So.3d 902 and writ denied, 2010-2500 (La.1/14/11), 52 So.3d 903 and writ denied, 2010-2517 (La.1/14/11), 52 So.3d 903 (emphasis added).

. The Appellees stated in the petition that "plaintiffs have a property interest at stake ... Each has either a written or implied employment contract with the Orleans Parish School Board and are protected by ... state law ... This state law is being intentionally circumvented by Board action to create charter schools thereby constructively terminating the employment of these ... employees.”

. The appellees alleged that the creation of the Charter Schools contributed to depriving the teachers of their right to employment.

. The petition asserts that the State was named as a defendant for purposes of determining the constitutionality of State statutes and Governor Blanco's Executive Order waiving employee rights in post-Katrina charter schools. Subsequently, on March 24, 2006, the Appellees moved to dismiss the State from the suit, but reserved the right to rename the State as a defendant, pending a court-approved amending and supplemental petition. On that same day, the employees were terminated.

.In that petition, the Appellees stated, "the Defendants, through acts of omission and commission, deprived the plaintiffs of constitutional rights to property, due process and equal protection, as guaranteed by the Constitution of the State of Louisiana.” Although the Third Amending Petition has several sections explicitly devoted to the unconstitution *57 ality of Act 35, the "Defendants,” including the State, are mentioned throughout the pleading in regards to the wrongful termination of the employees. The allegation against LDOE at that time was tortious interference with contract.

. The State responded by filing peremptory, dilatory and declinatory exceptions, which were all denied.

. The Appellees do not dispute this claim in brief.

. Jackson v. Ascension Parish Sch. Bd., 573 So.2d 501, 503 (La.Ct.App.1990); La. C.C. art. 3492.

. Cameron Parish School Bd. v. Acands, Inc., 96-0895, p. 6 (La.1/14/97), 687 So.2d 84, 88; La. C.C. art. 3492.

. Cichirillo v. Avondale Indus., Inc., 04-2894 (La.11/29/05), 917 So.2d 424, 430.

. La. C.C. art. 3462.

. Rivard v. Petroleum Transp. Co., Inc., 95-0431 (La.App. 4 Cir. 9/28/95), 663 So.2d 755, 759.

. Henderson v. SNL Distribution Servs., Inc., 11-1638 (La.App. 4 Cir. 4/11/12), 89 So.3d 417, 419.

. La. C.C.P. art. 1153.

. Katz v. Allstate Ins. Co., 2004-1133, p. 2 (La.App. 4 Cir. 2/2/05), 917 So.2d 443, 444.

. Giron v. Housing Auth. of Opelousas, 393 So.2d 1267, 1270 (La.1981); Levingston v. City of Shreveport, 44,000, p. 5 (La.App. 2 Cir. 2/25/09), 4 So.3d 942, 947; Cohen v. Brookshire Brothers, Inc., 2001-1159, p. 6 (La.App. 3 Cir. 6/5/02), 819 So.2d 429, 433.

. Gunter v. Plauche, 439 So.2d 437 (La.1983).

. Lewis v. Transocean Terminal Operators, Inc., 02-0152 (La.App. 4 Cir. 12/11/02), 834 So.2d 1180; see also, Masson v. Champion Ins., Co., 591 So.2d 399 (La.App. 4 Cir.1991) (out of time supplemental and amending petition can relate back to an original filing, even though it adds new cause of action if the amendment was based on general fact situation originally pleaded).

. See, e.g., Bertrand v. St. Paul Fire & Marine Ins. Co., 491 So.2d 474 (La.App. 3 Cir.1986) (Relation back of amended pleading allowed where original suit requested an injunction for destruction of evidence related to medical malpractice was later changed to request for damages for medical malpractice regarding same series of events); Gunter v. Plauche, 439 So.2d 437 (La.1983) (Relation back allowed where original pleading alleged surgical malpractice and amended pleading alleged breach of duty arising out of same botched surgery); Esteve v. Iberia Parish Hosp., 520 So.2d 848 (La.App. 3 Cir.1987) (Allowing relation back where original petition stated claim for medical malpractice such that defendant was on notice of factual scenario which amended claim for wrongful death arose out of); Miller v. New Orleans Home and Rehabilitation Center, 449 So.2d 133 (La.App. 4 Cir.1984) (Original petition was for tort arising out of work related injury and relation back was allowed when original pleading provided defendant with notice of facts related to later claim of worker’s compensation).

."This lawsuit relates to plaintiffs’ legal rights arising from their status as employees of the Orleans Parish School Board and all rights, privileges and benefits under state and federal law,” the first page reads. The third major heading of the original petition, "[vjiolation of plaintiffs’ constitutional rights” makes assertions regarding property interests and due process rights in their employment with the school board, their contracts with the school board, and their protection from termination under the Reduction in Force statutes. The last sentence of the first paragraph reads: "This state law is being intentionally circumvented by Board action to create charter schools *59 thereby constructively terminating the employment of these public employees.” The petition continues to mention the plaintiffs' loss of opportunity for employment and the adverse consequences this will have upon them and the School Board as a whole. These are the exact same allegations that lead to the plaintiff's claims of wrongful termination in the Fourth Amending Petition for damages. The plaintiffs set out constitutional violations of due process and property rights in their original petition; in the Fourth Amending Petition they list "Constitutional violations (due process and property rights)” as the first cause of damages.

. See Giron, supra; Gunter, supra; Merrit v. Administrators of Tulane Educational Fund, 639 So.2d 881 (La.App. 4th Cir.1994).

. See, Miller v. New Orleans Home and Rehabilitation Center, 449 So.2d 133 (La.App. 4th Cir.1984).

. 663 So.2d 755 (La.App. 4th Cir.1995).

. Rivard., 663 So.2d at 761.

. Id. at 759 (citing Tate, Amendment of Pleadings in Louisiana, 43 Tul.L.Rev. 211, 231 (1969)).